is Bettis v. Wade that's case number four one zero zero four zero five for the appellant Jacqueline Brandenburg-Reese for the appellee Dwayne Zupancy oh I'm sorry well I guess it's still early in the morning your honors I'm not going to belabor my argument here because I think the issue is really quite uncomplicated. My appeal to this court concerns the trial court's treatment of plaintiff's chiropractic expert Dr. Sash. In order that the court have some perspective here about the difficulty that the plaintiff had with the chiropractic experts I just want to state that in the predecessor case because this is the refile in the predecessor case plaintiff named a Dr. Theisler as the chiropractic expert. After he was named after opinions were disclosed I learned that he had been convicted of certain felonies concerning substance abuse and he was sent off to the penitentiary. At that point. Which doctor was this? This originally named doctor. The originally named doctor. At that point over defense counsel's objection then Judge Gramlich in the predecessor case allowed me to name a new expert and I named Dr. Sash. Dr. Sash disclosed his opinions based upon his education training and experience and his deposition was taken and admittedly he was not as strong a witness in his deposition as I would have liked. For a number of reasons plaintiff voluntarily dismissed the prior case. What was that deposition taken where you were able to discern that the testimony wasn't? When was it taken? Yes. That was taken in the predecessor case your honor. Okay. You know as to the exact. Like approximately. Just approximately. Sure I can give you the date on that as soon as my eyeballs focus. It was August 15, 06. Okay. Okay. So the case was voluntarily dismissed and refiled just short of one year later and in the refiled case plaintiff informed the court in a telephone conversation that she wanted to name a different chiropractor expert. The court denied that request. The court also denied any request to reopen discovery. That issue isn't really before the court but there was also an ancillary issue concerning the discovery of a new nurse at the hospital. Were there written motions filed with respect to these things? It was an oral motion in a telephone. If it was that there isn't as much formality perhaps as there is in other courts. That may not be the right answer but that is my explanation. And I had informed counsel ahead of time that that was going to be my request. In any event. Why didn't you put the name? For the reason I just stated your Honor. Okay. After that in March of 09 for the first time I learned of a letter that Dr. Sash, my poor chiropractic expert, had written to defendant Dr. Waite and I recited the actual content of that letter in my brief. Essentially what he's saying is I understand that this case had to be dismissed because I did such a lousy job. You may not believe this but I tried to help you. At that point all the bells and whistles went off in my head. Well no wonder he did the job he did. He was having second thoughts apparently about his loyalties perhaps to Dr. Waite. I don't know. In any event very shortly after me learning of that communication I asked the court for the right to conduct discovery to uncover what's behind this letter. My thinking I should be able to uncover bias or prejudice. The court denied my request to conduct any additional discovery. Couldn't you just contact Dr. Sash yourself? I did and was not satisfied with what he said to me. That's not a part of this record but I did in fact do that. And by this point my relationship with Dr. Sash had deteriorated. Not only was I upset that after all the time I had spent with him his deposition was as it was and he recanted essentially. Then I find out that he which I looked to be you know a pat on the back to Waite. I did what I could to help you. And when the court denied me the right to even look into what Dr. Sash had on his mind I needed that to be a record. What do you think you could have gained through discovery that you couldn't also obtain just by contacting either by phone or in writing Dr. Sash and posing the questions that you would have wanted answered in discovery anyway? What additional information? Actually and to get ahead of your honor a little bit I don't know how I would be able to get my court. But essentially what I think was going on was this. Dr. Sash had left the area. He was no longer in competition with Dr. Waite. Now this is just me giving my suppositions. I think that he no longer saw competition between the two chiropractors and perhaps in his mind was that he wanted to somehow discredit Dr. Waite so that he would get more business. It's Carlinville, Illinois we're talking about. He had since gone on to another area and was engaged in some other occupation involving teaching and seeing fewer patients. He is by his own admissions a very Christian man. He felt bad about testifying for me in this case and wished that he hadn't. Things of that nature your honor. Okay. Well where do we see this? Did you put that in writing? I did not put that in writing your honor. But I asked the court on the basis of the letter. How do you expect us to look at something and say well this is what I said. We have no basis for it. What your honor says is true but had the court allowed me to take a short deposition of Dr. Sash I could have uncovered these things. And I want to also indicate your honor there was a point, this is sort of a parallel, there was a point when I discovered a nurse at the hospital who said contrary to the emergency room doctor who the defense counsel had deposed to Dr. Kehoe, this nurse said contrary to what Dr. Kehoe would say when this lady came into the hospital oh my gosh. Was all this presented in writing to the trial court? I filed an affidavit as to my discovery of the additional nurse BJ Ganz and I don't have the affidavit in front of me but I did say that she had testimony that would contradict the emergency room doctor and that she was a critical witness in the case. I should know but I really couldn't follow it. The lady had been a patient of Dr. Wade since 1986? Yes your honor. Let me give just a little brief history. This was a woman in her 40s. She had been a patient of Dr. Wade since 1986 for a myriad of symptoms. Tension, some back aches, headaches, migraine headaches and she relied on him as a primary care treater. He also saw her at times when she had high blood pressure. When she came in to see him at the critical point in 2003 she had not had a severe or migraine type headache for two years. Dr. Wade treated her symptoms on that day as same old stuff. He applied ice massage, ice and close to 3 o'clock in his office until finally he said to his reception staff, call the husband, I think she needs to go to the hospital. Didn't call an ambulance, didn't send her vitals on the way to the hospital. That's all done the same day within a couple of hours? Within a couple of hours, that's correct. So the husband drives the decedent to the hospital and on the way to the hospital she is having the classic worst headache of her life. She cannot sit back in her seat. She's holding her head up toward the dash. She gets to the hospital and this is when everything goes to pot. She starts vomiting. She has the paralysis of the one arm. You know, they do the imaging scans and they find out that she has a cerebral aneurysm. At that point she is shipped off to Springfield by air ambulance. Dr. Pensick operates on her and in his deposition he said, I would have liked to have gotten to her sooner. No one knows for a fact whether the woman would have survived or not, but clearly she lost her last chance. Okay, so that's the history of the case. Even Dr. Wade's involvement and the involvement of the emergency room was all within a two-hour period? Probably within close to four hours, I believe. Close to four hours. Well, the record would show, because you probably made that a part of the record, to show how many hours and what the times were? Not a part of the record in this case, Your Honor. It was a part of the prior record. I did not look specifically at what the outcome would be, pending all the evidence in the case when I filed this appeal. I looked at whether the trial courts denying me the right to name an additional chiropractor expert and to depose Dr. Sash as to this goofy letter he sent to Dr. Wade. That was the focus in this appeal. Further, I wanted to concentrate in this appeal on whether Judge Narduli was correct in knocking out all of Dr. Sash's opinions. I didn't want to be left with those opinions, but I was. Was he proper to knock them all out? Was it necessary for the defendant to file new motions in limine in the second case, or was it proper for those to be considered since they'd been filed initially, before the case was voluntarily dismissed? Well, if the court treats this as a new and refiled case, then it is that. And in my experience, parties can either agree to adopt discovery, etc., from the prior case, or if there is no request of the court, and, you know, have the court make all of the prior discovery applicable. Is that controlled by, is it section 219E? I believe that might be, I believe that might be correct, Judge. And was that complied with? I apologize, Your Honor. I don't have the full statute in front of me. We're going back with respect to your discovery part, and your request to have additional discovery. You did do that, didn't you? I'm sorry? You did ask to have additional discovery? I did, Your Honor. Did you put that in writing? No, I did that orally in the conference, but it's documented in the court's docket entries, Your Honor. What we did is, Judge Narduli was new to the case. We had what I'm going to call sort of an informal telephone conference, both counsel and his honor. And basically the conversation was, well, where are we with the case? Well, Judge, here's what I want to do. Here's where we were before. I want to name a different expert. Well, no, Judge, we object to that. He denied that request. At a later point, I brought up the issue of the nurse that I had discovered. And the court asked me to file an affidavit essentially directed to when I first learned of the nurse and what her testimony was going to be. I filed the affidavit at the court's request. That request was also denied. May I move on to the second issue that I'd like for the court to look at, which is whether the trial court properly threw out all of Dr. Sash's opinions? You're going to address the standard of review issue? I did in my brief, Your Honor. But that's not what you're perceiving. You don't want to talk about that? Correct. Here? Not necessarily. I'd like to confine my time to Dr. Sash's opinions. In August of 2009, Judge Narduli entered an order, and basically what he said is, any opinion that talks about these risk management guidelines, they're out. Any opinion that talks about the standard of care, that's out. Counsel, I misspoke. I meant standard of care. I think I said standard of review. So you are going to that issue here. Thank you. Thank you. I was confused. I didn't want to let it be that obvious. Thank you. And basically what the judge said on page two of his opinion, and I'd like to read it, in reviewing Dr. Sash's deposition, it's impossible to separate out what portion of Dr. Sash's opinion is based upon his education and experience, what portion is based upon the home study OMPAC, and which portion is based upon his own practices, to which he acknowledges other chiropractors might not agree. Here's the important part. And which implies to this court that his personal practices do not reflect the standard of care. So I think that's kind of a wild conclusion for the trial court to make, because I can't understand where he's coming from. I'm going to throw it all out. We had no opportunity at trial to rehabilitate Dr. Sash. Now Dr. Sash, what is the basis of that opinion? Well, to clean up, if you will, this poor witness. And rather, Judge Nardulli just said, I just think it would be impossible for defense counsel to know what to do with this witness on the stand. Quoting cross-examination without reference to the basis of many of the expressed opinions would be impossible. And therefore he said, essentially plaintiff's case has to go to the court. At that point, defense counsel filed their motion for summary judgment. I, in good faith, could not say, Judge, I'm still going to whip something out at trial. No, once all of those opinions of my expert were thrown out, and in essence my expert was disqualified, I had absolutely no expert on standard of care. And in large part, no credible evidence to present because Dr. Sash had recanted so much of what he said. What I'm asking the court as to Dr. Sash's testimony is to agree with me along these lines. Look, he may not have been the best witness, but under the circumstances, that was all plaintiff had. She tried to get somebody else. She couldn't do it. She should have, at a minimum, been allowed to let a jury decide whether this was a credible witness or not. The trial court talked about, what is the name of the case, Chamniss v. Odom. It was cited by you. Okay. What did he say about it? Well, what the court said is that that case recognized the principle that the plaintiff's expert was speaking about the chiropractic community, not simply his own opinions. That's the reference that the court made to it. Well then, did he refer to Dr. Sash's testimony? He did. He did. What he said was that as of the point that he viewed the deposition of Dr. Sash, he couldn't find, he couldn't find that there was a proper foundation for these opinions. And I totally disagree. He was a practicing chiropractor. Well, it's a question of whether there's a proper foundation, one for the court or one for the jury. I think, I think that it goes to credibility. Number one, I think that there was a proper foundation. Dr. Wade testified about all of his experience and his education and his training. He got off into this goofy area of the risk management guidelines and the mercy guidelines because he kept being pressed. Well, what else? And what else? And what else? Anything in writing? And what else? And what else? Then he starts talking about these goofy references. Okay. But he had already laid the foundation based upon all of his education, training, and experience. And I think that for the court to say there was no foundation wasn't reasonable. And if it goes to that trial, whether there is an adequate presentation of his credentials so that the jury will believe him, that's something that the jury should decide. That does go to his credibility. Okay. You'll have time on rebuttal. Thank you very much. Thank you, Your Honors. Counsel? Good morning, Your Honors. My name is Dede Zupanze. I represent Dr. Wade in this case. As Ms. Renderer-Reese said, this case is very simple in terms of the issues on appeal. I'd like to give the court just a very brief, substantive background on this case, very brief procedural history, because there are some significant issues that I think the court should be aware of. Dr. Wade is a chiropractor and has been practicing in Carlinville for over 30 years. He had been seeing Joya Bettis as of 2002 for 16 years for many things, primarily headaches and migraines. She came to his office on September 20, 2002, with a severe migraine and elevated blood pressure. Dr. Wade treated her, assessed her in many of the ways that he had before for her headaches, took her blood pressure. At one point, it was quite elevated. Let her rest, took it again. It had decreased. Let her rest, took it again, and it was elevated again. At that point, he realized that this was a medical condition, not a chiropractic condition, and she needed medical care. He offered to call an ambulance. She preferred that her husband come to get her. The hospital in Carlinville is not too far from his office. She then went to the hospital, to the emergency room, was seen there by emergency room physician Dr. Patrick Keogh. Dr. Keogh was deposed in this case, and his records indicate that after his assessment, he chose to discharge her. However, right before discharge, and he marked it in the record, discharge. Right before discharge, she had a change in neurological status. She vomited and had a left side facial groove. He then canceled the discharge, sent her to have an emergency head CT done, and at that point, they realized that she had a very large interporeal bleed, meaning it was in the gray matter. Our physician at trial would be that she was not having an interporeal bleed, a ruptured aneurysm, until she got to the emergency room. Had Dr. Wade kept her for any shorter period of time, she still would have gone to the hospital and been discharged home and had a much less chance of getting to a hospital. She was in the best situation that she was. She did go to Memorial Hospital in Springfield. However, unfortunately, she was not able to survive her condition and passed away. Dr. Penchik was the treating neurosurgeon in that case, in her case. The medical malpractice case, the lawsuit was filed in Macoupin County in 2003, approximately one year after she passed away. Dr. Wade was the only defendant. The case, as Ms. Brandenburg-Reese mentioned, their first expert was Dr. Theisler. He was not able to testify at trial because of his criminal issues. Over the objections of the defendant, the court allowed them extra time to find a new expert. It was then that Dr. Sash was disclosed. He was deposed. Dr. Frank Baker, their ER expert, was deposed. All the defendant's experts were deposed. Factual witnesses were deposed. The case was set for trial on October 1, 2007. In July of 2007, the defendant filed a motion in limine to bar the testimony and opinions of Dr. Sash, of Dr. Baker, as well as a motion for a friary. Six days after those motions were filed, the plaintiff filed a motion to voluntarily dismiss the case. Judge Gramlich, who was the presiding circuit court judge at the time, granted their motion for voluntary dismissal upon payment of costs and made a 219E finding that there had been discovery violations in this case, in addition to the taxable cost, awarded some discovery costs as a sanction in that first case. The case was then dismissed in December of 2007. The case was refiled timely within the one year in December of 2008. It was the exact same case, same allegations, everything. A few months after the case was filed, the defendants filed a motion to set for hearing the pending motions from the previous case, which were the two motions to bar and the motions for the friary hearing. In that motion, we argued because there was a 219E finding and because of what 219E says, meaning a plaintiff cannot avoid discovery deadlines and the barring of testimony by voluntarily dismissing the case, which is what had happened in the previous case, discovery must pick up where it left off from the prior case. The court agreed and set those motions for hearing. So your position is pursuant to that rule, there was no need to refile the motions in the new case? Correct. We did not take the technical step of refiling the motions. We could have just simply refiled the motions, but found no reason to do that under pursuant to 219E, and the court agreed. There was no objection filed by the plaintiff to our motion to set for hearing those three motions. The court then heard the motions as Ms. Brandenburg-Reese relayed to you, the motions were granted. The friary hearing was denied as moot because the court made the finding that Dr. Sash's opinions did not meet the general acceptance test under FRI, because he admitted himself not necessarily agreed to by the chiropractic community. Your position would be then that the question whether the standard of care has been established is not for the jury but for the trial court? Correct. The trial court in this particular case needs to decide whether or not there is an adequate foundation that has been laid for the testimony. Dr. Sash is quote unquote qualified as a chiropractic expert based on his experience. However, that's not the only thing the court must consider. The court must consider the basis for his opinions, and the court had three reasons, not just the FRI issues. The court gave three reasons as to why Dr. Sash's testimony should be barred, his opinion should be barred. First and education as the basis for his opinions, but he also relies upon his risk management documents from his liability carrier. The court gave that as the first reason as to why his opinion should not be allowed to be heard by a jury. The second reason was the plaintiff, and the plaintiff doesn't really address this in her brief, there was no proximate cause that was established in this case whatsoever. And I will get to that in a moment in terms of the motion for summary judgment. Under Illinois law, if the plaintiff has, in medical malpractice cases, if the plaintiff has failed to link the alleged negligence with causation, those opinions must be barred. There was no proximate cause evidence in this case, and therefore the court gave us a second reason. Getting proximate cause is a question for the jury though, isn't it? Except, except when, in medical malpractice cases, I want to get to the language so the court can have that. Normally, proximate cause is a question for the jury. However, when the, in medical malpractice cases, when the plaintiff has failed to produce any summary judgment for failure to establish proximate cause. And just addressing that here, the court gave, as part of its granting of our motion for summary judgment, not only the failure to establish standard of care since Dr. Sash's opinions had been barred, but also because the plaintiff failed to produce any evidence of proximate cause. None of their medical experts gave any opinion that any negligence by Dr. Wade caused the death of Joy Bettis. And the plaintiff did not argue that either in the trial court, did not raise that in her brief, and therefore has waived that issue. And that's the, that's the crux of this appeal here. The court granted our motion for summary judgment was twofold. One, in medical malpractice cases, you must establish standard of care through expert testimony. The only qualified expert they had was Dr. Sash. All of his opinions were barred, properly barred by the court. They therefore had no standard of care expert, therefore they had no standard of care testimony as required in their Illinois law. They also must provide expert testimony to establish proximate cause. None of their experts had any opinion as to proximate cause. Dr. Sash testified that he's not qualified to offer an opinion on proximate cause. He leaves that up to the treating surgeon, which is Dr. Penchik. Dr. Penchik said he couldn't tell if Dr., if he didn't know whether or not Dr. Wade's actions or inactions as it, as it were, led to her death. Yes, he said he would have liked to have gotten to her sooner. That's all he said. But he also testified that sure, time, I would like time. Whether or not he did anything wrong in not giving him that time, he can't testify. Dr. Baker, their ER expert, also defers to the neurosurgeon. There was no evidence of proximate cause whatsoever, and that's fatal to their case. And that's not a question of fact? No, no. If there's no evidence whatsoever of proximate cause, then it's a question for the court. So your position basically then is that the standard of care was not established as a matter of law? Correct. And no proximate causation was established as a matter of law? Correct, correct. And so the, and we can talk about all the minutiae that's involved in this case, because there is quite, there's quite a bit. Dr. Sash's deposition, he testified to whether or not he was pressed in the deposition. That's the purpose of cross-examination of a witness. We did not force him to say that he relied upon these documents. In fact, we didn't even really know about these documents until he testified, yes, I'm relying upon these documents that I have received from my liability carrier. The motion to reopen discovery, I believe they did make an oral motion or an oral, this is what we're planning to do. There was nothing in writing. There was nothing on file. There was nothing for the defendant to open discovery. It was actually in response to our motion to set the motions in limine for hearing. Because in that, within that motion, we argued that 219E applies to this case and there should be no further discovery. And so the court's order. Well, if plaintiff's expert witness flips, so to this record that he flipped. He gave a deposition that while weak, absolutely at no time did he ever say, I feel uncomfortable or I cannot give you testimony that I believe that he deviated from the standard of care. His opinions were, Dr. Wade deviated from the standard of care. Dr. Sash then according to his letter, said that he received a call from counsel saying that the case had been dismissed because of his testimony. There was nothing to indicate that he could not come to trial and testify as he did in his deposition. His letter didn't say, I tried to help you. And I have a copy of the letter if the court would like to see it. The letter said, and I quote, whether you think so or not, I believe that I helped you. We have no idea why he wrote that. Ms. Brandenburg-Reese may have an idea, but there's nothing in the record to indicate that he would not, that he was changing his opinions in any way. Nothing in here says, now I'm going to testify that you didn't deviate the standard of care. He testified at his deposition and the 213 discovery disclosure says that he believes that Dr. Wade deviated from the standard of care. The problem is that he has a, he has no basis for those opinions. He says it's his education experience, but it's also relying upon his risk management documents. And also the third reason why the court barred his opinions was because they were based upon speculation and there was no foundation. So the court had more than one reason to bar the opinions of Dr. Sash. The plaintiff in this case was on their second expert. Are we going to ask the court and give the plaintiff the ability to just keep going through experts? I didn't like their testimony. Let's see what else I can get until I can get a strong enough expert that I'm happy with to go to trial. That's not the way these cases work. This case is already eight years old. This case was filed in 2003. It's on its second appeal. And while the plaintiff is allowed some leeway under the law, the plaintiff has already gone through and gone by Rule 218 deadlines on two occasions. We can't allow parties to put, to disclose an expert, give their opinions. We take their deposition and just because counsel is unhappy with what they said because they don't think they're going to win their case, then give them a third bite at the apple. That's not what is provided under Illinois law and it's extremely prejudicial to defendants. And I will say also, plaintiff's brief also mentions the motion to bar Dr. Baker. He's their ER expert and that his issue is really not up on appeal and it's really not an issue on this appeal, but the court did bar his testimony also as to standard of care and the court, I just want you to be aware of, he testified that as an ER physician he could testify as to the standard of care of a chiropractor. The court found that that's not the case because that is not allowable because they have separate licenses and under Illinois law that is not allowed. So Dr. Baker cannot testify to standard of care. Dr. Sash cannot testify to standard of care. So the plaintiff would have no standard of care expert to testify at trial, which is required. Seeing no questions, thank you very much. We have rebuttal now. Just answering a few of the comments that counsel made. Dr. Baker was the ER physician. He testified that he could offer an opinion as to the standard of care of a treater of headaches. And if Wade held himself out as an expert in the treater of headaches, he fell very far short. So he didn't really say he was testifying as to the standard of care of a chiropractor. The other standard of care expert, of course, was Dr. Sash. And we've already talked about the fact that once I lost him, I had no case. I didn't even have to go to proximate cause. I didn't have to argue proximate cause one way or the other because without standard of care, with Dr. Baker thrown out, which I didn't have a terrible amount of quarrel with, but certainly I did have quarrel with the fact that I lost my standard of care chiropractor. As far as missing 218 deadlines, the court, after I paid $4,700 for the privilege of being able to voluntarily dismiss and refile the case, then wrote a rather scathing opinion about all of my conduct. And this court, in reviewing the record, said, well, even though Judge Gramlich didn't say there were any 219 violations, the fact that he ordered her to pay $4,700, which were deposition costs, that's tantamount to 219 violations. But that's history, so I really can't go there. But as far as blowing any deadlines, there was no deadline blown. There were requests of the court to extend time to me to do a particular act. Thank you. Thanks to both of you. The case is submitted and the court will stand recessed.